## ABEL FRENCH, JR., vs. ROBERT D. CARHART.

Where a deed given in 1829 contained a clause by which it was made subject to a reservation contained in a conveyance of the same premises given in 1793, between other parties, and the question was upon the construction of the deed of 1829 ; *held*, that it was to be construed in the same manner, as though the language of the reservation as contained in the original deed were incorporated into and formed a part of the one in question.

In the construction of deeds and other instruments the intention of the parties is to govern, and where the language used is susceptible of more than one interpretation, courts will look at the surrounding circumstances existing when the contract is entered into, such as the situation of the parties, and of the subject matter of the contract.

A conveyance of real estate contained a clause referring to and adopting the reservations and conditions in a former conveyance of the same premises, and the reservation in such former conveyance was in these words : "Saving and always excepting to the said parties of the first part, their heirs and assigns, out of this present grant and release, all mines and minerals, that are now, or may be found within the premises hereby granted and released, *and all the creeks, kills, runs and streams of water*, and so much ground within the same premises, as they, the said parties of the first part, their heirs and assigns may think requisite and appropriate at any time hereafter, for the erection of the works and buildings whatsoever, for the convenient working of the said mines and also all such wood, fire wood and timber as they may think proper to use in building, repairing, accommodating, and working the said mines, with liberty to them, their heirs and assigns, and their and each of their servants to dig through and use the ground, for either of the said purposes, and to pass and repass through the premises, with their and each of their horses and cattle, carriages and servants, and to lay out roads therefor,"—and the habendum clause, contained a condition that the grantee, his heirs, &c., should not erect, or permit to be erected, any mill or mill dam upon the stream of water on the premises granted ; *held*, that the reservation of the stream was for all purposes and not for mining purposes merely.

And in aid of this contruction ; *held* also, that it was proper to consider the evidence, which shewed that when the deed in question was given, the grantor owned the premises immediately below, on which were situated and used a a mill and dam, which set the water back on to the land conveyed, and that the grantee knew of the existence of such mill and dam, and of the manner in which the stream was affected by their use.

*Held* also, that the reservation was not merely of the natural bed of the stream, but of a right to use the stream in the same manner, and to set back the water to the same extent, as when the grant was made.

Whatever is necessary to the fair and reasonable use of the thing excepted, is is also reserved as incident to the exception.

A reservation in a deed of a right or privilege should be construed in the same

way as a grant by the owner of the soil, of a similar right or privilege. *Per* JEWETT, CH. J.

If the language of a deed is ambiguous, the Court, in order to arrive at the intention of the parties, may look at their subsequent acts, and the manner in which the thing granted has been used, and enjoyed under the grant. *Per* JEWETT, CH. J.

Error from the Supreme Court. Carhart sued French for overflowing his land, situated upon a creek, called the Normanskill in Guilderland, Albany County, by means of a dam erected upon the stream below the premises overflowed.

On the trial at the Albany Circuit before Cushman, Circuit Judge, in October, 1843, the evidence tended to shew that in 1793, Abraham Ten Broeck and Wife gave a perpetual lease of the premises claimed by the plaintiff below, to John Bullock, which contained a reservation in these words: "Saving and always excepting to the said parties of the first part, their heirs and assigns, out of this present grant and release, all mines and minerals, that are now or may be found within the premises hereby granted and released, and all the creeks, kills, runs, and streams of water, and so much ground within the same premises, as they the said parties of the first part, their heirs and assigns may think requisite and appropriate at any time hereafter, for the erection of the works and buildings whatsoever, for the convenient working of the said mines, and also all such wood, fire-wood and timber, as they may think proper to use in building, repairing, accommodating, and working the said mines, with liberty to them, their heirs and assigns, and their and each of their servants to dig through and use the ground, for either of the said purposes, and to pass and re-pass through the premises, with their and each of their horses and cattle, carriages and servants, and to lay out roads therefor." In the habendum clause of the same lease, was a condition in these words: "And upon this condition, that neither the said John Bullock, nor his heirs, nor assigns do at any time hereafter erect or permit, or cause to be erected, any mill or milldam upon any creek, kill, river, or stream of water, within the premises hereby granted, nor give, nor cause to be given, any manner of let or obstruction whatsoever to the said parties of the first part, their heirs or assigns,

13

to their and each of their prejudice in the full enjoyment of the rights, titles, and privileges saved to him or them by the saving and exception, before in these presents above mentioned." Then followed a clause giving a right to re-enter on failure in performance of the conditions.

In 1805, Ten Broeck and Wife conveyed to James McKoun and Abel French, Sen., the premises claimed by the defendant, and on which the dam in question is erected. This conveyance contained in the granting part the following clause: "Together with the privilege of erecting a dam at the fall above mentioned," (referring to the location where the dam in question is erected) not "exceeding five feet in height." As early as 1817, Abel French, Sen. erected a dam at the place indicated by this deed, and this dam (having been one or more times washed away and re-built) was continued down to the time of the trial, and during that period the water raised by such dam was used to supply a flouring mill upon the same premises. The defendant below rebuilt the dam in question in 1839.

On the 17th of February, 1829, Abel French, Sen. had become owner, under the titles from Ten Broeck, of the premises claimed by the plaintiff and defendant respectively, and on that day he conveyed the plaintiff's premises, (the same described in the declaration) to Jeremiah Van Auken, "*subject, among other things, to such covenants, reservations, and conditions, as are mentioned in the original deed or lease formerly given by Abraham Ten Broeck, deceased, to John Bullock.*" Van Auken went into possession and occupied until April, 1837, when he conveyed the same premises to the plaintiff, with the same reservations, and the like reference to the lease from Ten Broeck. The premises are bounded in these deeds, " on the South by the Normanskill." The defendant also derived his title from Abel French, Sen., to the premises on which the dam complained of was built. The evidence also tended to shew, that Van Auken during the time that he owned and occupied the plaintiff's premises, made no objection to the continuance of the dam, and that the

French *v.* Carhart.

plaintiff at the time he purchased, was acquainted with the premises, and knew of the existence of the dam, and the manner in which it affected the stream. The weight of testimony also went to shew, that the dam as rebuilt by the defendant raised the water no higher than the dam which preceeded it had done, and no higher than it was raised when Van Auken and the plaintiff purchased respectively. The water was set back over a mile, and covered some three or four acres of the land claimed by the plaintiff. It did not appear that any mines or minerals had ever been found on the premises.

The Circuit Judge charged the jury that the only question for them to pass upon was as to the amount of the plaintiff's damages, that the plaintiff had shewn a perfect title to all the land covered by his deed *to the middle of the Normanskill, subject only to the reservation of the stream for mining purposes.* The defendant's counsel insisted and requested the Circuit Judge to charge, 1. That the conveyance of French to Van Auken, bounded Van Auken on the edge of the stream as it then was, and gave him no title to the land then under water. 2. That the reservation of all creeks, kills, streams and runs of water, was absolute for any and every purpose. 3. That the location of French's deed was a question of fact for the jury. 4. That the reservation in question was ambiguous, and its construction should be left to the jury upon the instruments themselves, and the surrounding circumstances which had been given in evidence. The Circuit Judge refused so to charge, and the defendant excepted to his charge and refusal to charge as requested. The jury found for the plaintiff. The Supreme Court on bill of exceptions refused to grant a new trial and gave judgment for the plaintiff.

*J. Van Buren,* (Atty. Gen'l.) for plaintiff in error.

I. The Judge erred in charging the jury that the reservation of " all creeks, kills, streams and runs of water" in French's deed was a reservation only for mining purposes.

1. The "covenants, reservations and conditions" in the lease from Ten Broeck, are a part of the deed from Abel French, Sen., to Jeremiah Van Auken, under which plaintiff claimed title.

2. The reservation of "all creeks, kills, streams and runs of water" is absolute. (*Oakley* vs. *Stanley*, 5 *Wend*, 523; *Provost v. Calder*, 2 *Wend.* 517.)

3. The construction thus given by the Court to the deed from Abel French, Sen., in 1829, destroys the valuable prescriptive right the defendant has acquired by twenty-five years adverse possession.

II. The conveyance from French to Van Auken, with the reservation contained therein, bounded the said Van Auken on the edge of the stream as it then was, and gave him no title to the land then under water. (*Childs v. Starr*, 4 *Hill*, 369.)

III. The Judge erred in refusing to submit to the jury as a question of fact, the true location of French's deed to Van Auken. (*Frier v. Van Alen*, 8. *J. R.* 495; *Livingston v. Ten Broeck*, 16 *J. R.* 94; *Rockwell v. Adams*, 7 *Cow.*, 761; *Dibble v. Rogers*, 13 *Wend.* 536.)

*M. T. Reynolds,* for defendant in error. 1. The conveyance from French to Van Auken being absolute, and without reserving any right to flow any part of the lands conveyed, except such right as is reserved in the lease from Ten Broeck, divested the grantor of a right to flow the land conveyed. 2. The reservation in the lease referred to is in terms confined to the use of the stream for mining purposes only. 3. The grant containing an express reservation, thereby more strongly excludes all implied reservations.

JEWETT, CH. J. Taking into consideration the words of the exception and condition annexed, it appears plain to my mind that the reservation of the creeks, kills, runs and streams of water, was intended by the parties to the conveyance to be absolute and unqualified. There is an obvious distinction between the reservation, as it relates to mines and minerals, and

the creeks, kills, runs and streams of water, and as it relates to the ground and wood, fire-wood and timber.   In respect to the two *first* objects of the reservation, it applies, by its terms, to *all* of the mines and minerals, and to *all* of the creeks, kills, runs and streams of water.   In regard to the *latter* two, the language is changed and qualified to *so much* ground, and *all such* wood, fire-wood and timber, as should be necessary for mining purposes, and excluding such part of the ground, and so much of the wood, &c., as should not be necessary for those purposes.

But conceding that the language is ambiguous, so as to cast a doubt upon the construction, there are extraneous facts in the case which deserve an attentive consideration.   The *language* of the reservation we are considering, is found in the original perpetual lease from Ten Broeck to Bullock, given in 1793, but it is referred to and adopted in the deed from French to Van Auken in 1829, and is therefore to be construed precisely as though it were incorporated into and formed a part of that deed.   Now the time when, and the circumstances under which that conveyance was made, are, as it seems to me, of great importance in the construction of the conveyance itself.   The same dam now complained of was then in existence, and had existed for a long period.   It was then, and had for many years been used to supply a head of water to operate the mills of the grantor a few rods below the premises granted.   Those mills would be rendered useless and valueless without a continuance of the same right.   No *mines or minerals* had ever been discovered, nor does it appear that either of the parties believed, or had any reason to believe, that any would ever be discovered, so as to render the reservation, under the construction claimed by the plaintiff below, of the least possible utility.   These circumstances were in the view and contemplation of the parties at the time this reservation was incorporated into the deed of 1829, and they demonstrate, to my mind, that the intention was to reserve the waters of the Normanskill, for the same uses to which they were then, and had for a long time been applied.   The con-

trary supposition involves an absurdity which ought not to be imputed to either of the parties. Upon the construction which I place upon the reservation, the reason and object of it are plain and obvious. Upon the construction claimed by the plaintiff, it seems, to say the least, without any adequate object or aim.

It is a cardinal rule in the construction of contracts, that the intention of the parties is to be enquired into, and if not forbidden by law, is to be effectuated. Too much regard is not to be had to the proper and exact signification of words and sentences, so as to prevent the simple intention of the parties from taking effect. And whenever the language used is susceptible of more than one interpretation, the Courts will look at the surrounding circumstances existing when the contract was entered into, the situation of the parties, and of the subject matter of the instrument. To this extent, at least, the well settled rule is, that extraneous evidence is admissible to aid in the construction of written contracts. (*Wilson vs. Troup*, 2 *Cow.* 195, 228; *Parkhurst vs. Smith, Willes. Rep.* 332; *Bradley vs. The Washington, Alex. & Geo. S. P. Co.*, 13 *Peters* 89; *Gibson vs. Tyson*, 5 *Watts.* 34.) Applying this sound and rational principle to the language of the reservation in question, and to the extraneous circumstances just noticed, and it would seem impossible to err in the construction.

Another rule of construction is, that when the words of a grant are ambiguous, the Courts will call in aid the acts done under it, as a clue to the intention of the parties. (*Livingston vs. Ten Broeck*, 16 *Johns.* 22; *Atty. Genl. vs. Parker*, 3 *Atk.* 576; *Atty. Genl. vs. Foster*, 10 *Ves. Jr.* 338; *Weld vs. Hornby*, 7 *East.* 199; *Rex vs. Osborn*, 4 *East* 327; *Doe vs. Ries*, 8 *Bing.* 181 *per Tindal, C. J.*) Upon this principle we are permitted also to look at the undisturbed use of the right contested, on the one side, and the unqualified acquiescence, on the other, down to the time of the plaintiff's purchase of the premises in 1837; and these circumstances are also justly entitled to weight in the construction of this reservation.

I therefore come to the conclusion that the unqualified right to use the water of the Normanskill for milling purposes upon the premises of the defendant, was reserved in the deed of 1829. And that being so, it followed, that the right to flow so much of the land conveyed by that deed as was necessary for the reasonable and full enjoyment of the reservation, was also reserved. This reservation should be construed in the same way as a grant by the owner of the soil of a like privilege ; for the rule is, that what will pass by words in a grant will be excepted by the same words in an exception. (*Shephard's Touchstone*, 100, 1 *Saunders*, 326, *n.* 6 ; *Doud vs. Kingscote*, 6 *Mees. and Wels.* 197 ; *Hinchliffe vs. Kennard*, 5 *Bing. N. C.*) Now if Abel French, Sen., who owned the premises of both parties when the deed of 1829 was executed, had then conveyed the premises of the defendant below with " all the creeks, kills, runs and streams of water," the right to the beneficial enjoyment of the dam, mills and privileges, situated on those premises would have passed by such conveyance, as a necessary incident to the subject matter actually granted, although not specifically named. (*Shephard's Touch.* 89, *Bac. Abr. Title Grant,* 1. 4. ; *Price vs. Braham, Vaughan's Rep.* 109.) Upon this principle if a man having a close to which there is no access except over his other lands, sell that close, the grantee shall have a right of way to it, for without it he cannot derive any benefit from the grant. So if the grantor should reserve that close to himself, and sell his other lands, the law will presume a right of way reserved. (*Howton vs. Frecusson,* 8 *Term Rep.* 50 ; *Holmes vs. Goring,* 2 *Bing.* 56 ; *Clark vs. Cogge,* Cro. Jac. 170 ; *Jorden vs. Atwood, Owen Rep.* 121 ; *Nickols vs. Luce,* 24 *Pick.* 102, 1 *Saund.* 323, *n.* 6 ; *Collins vs. Prentice,* 15 *Conn. R.* 39, 3 *Kent. Comm.* 421, 422, 5th *Ed.*) The way in the one case is granted by the deed, and in the other case reserved. And although it is called a way of necessity, yet in strictness the necessity does not create the way, but merely furnishes evidence of the intention of the parties.—For the law will not presume an intent that one of the parties should convey land

to the other in such a manner, that the grantee can derive no benefit from the conveyance, nor that he should so convey a portion as to deprive himself of the enjoyment of the remainder. Under such circumstances the law will give effect according to the *presumed· intent* of the parties. The sound and reasonable rule is, that whatever is necessary to the fair enjoyment of the thing granted or excepted, is incidentally granted or excepted. (*Liford's Case* 11, *Coke.* 52; *Doud vs. Kingscote*, 6 *Mees. and Wels.* 174; *Hodgson vs. Field*, 7 *East.* 613.)

In the case before us, French, the grantor in the deed of 1829, when he conveyed the premises overflowed, to Van Auken, the plaintiff's grantor, retained to himself the premises below on the same stream, and he expressly reserved the stream itself, by the phrase "all creeks, kills, runs, and streams of water." On the premises not granted he possessed mills, which would become worthless, if the reservation is to be construed so as to apply only to the stream in its natural course. Under these circumstances I cannot doubt that the phraseology employed by the parties was intended to indicate the stream in the condition it then was, and to reserve it for the uses to which it was then, and had been applied. And in adopting this construction, I do not think we do any violence to the language in which the parties chose to express themselves.

I am of opinion that the judgment of the Supreme Court should be reversed, and a *venire de novo* issued by that Court.

GARDINER, J.   The main question in the cause, is as to the true meaning and effect of the conveyance from Van Auken to the plaintiff, or which is equivalent thereto, the effect of the deed from Abel French, Sen., to Van Auken.

The *reservations, conditions*, and *covenants* contained in the lease from Ten Broeck to Bullock, are made parts of the deed from A. French, Sen., to Van Auken, and of the latter to the plaintiff, and must be construed as I apprehend in the same manner as if the language of the lease in these particulars had been incorporated into those deeds respectively.

Such is the legal inference from the reference in those deeds to the lease in question, (4 *Wend,* 374.) and the obvious import of the terms adopted by the parties.

The premises are conveyed to Van Auken, "subject to a rent of five bushels of wheat, one third part of a load of wood, and to such other covenants, reservations, and conditions, as are *mentioned* in the deed to Ten Broeck." The reservations as to the rent and wood are placed upon the same footing with the covenants, conditions, and reservations in the lease, and are all adopted by the parties in *presenti,* as parts of the contract then made.

The exception in the lease above mentioned is in the following words : "Saving and always excepting to the said parties of the first part, out of the present grant and release, all mines and minerals that now are or may be found within the premises hereby granted and released, and all the creeks, kills, runs and streams of water." If the exception had stopped here, there probably would be no difference of opinion as to its construction. Two distinct subjects, mines and water are referred to, and both are excepted by the same general terms from the operation of the grant. The exception then proceeds to a new subject,—"and so much ground within the same premises, as the grantor may think requisite and appropriate at any time hereafter, for the erection of works and buildings for the working of said mines; also such wood and timber, as they may think proper for the working said mines, with liberty to dig through and use the ground for either of said purposes, to pass and repass with horses, &c., through the premises and lay out roads therefor." The latter clause of the exception above quoted, unquestionably refers to mines as the principle subject with which they are connected, and to which they are limited. The language is, so much ground, also such wood, as may be thought necessary for mining purposes." But it is not perceived how this in the slightest degree qualifies or restricts the previous general exception as to the creeks, streams, &c. The language of the exception in reference to the latter, is not "so much of the

14

creeks, kills, runs and streams of water," are excepted as the grantor or his assigns may think requisite and appropriate for mining purposes, or any other special object; but all creeks, &c., without limitation of any kind, are reserved absolutely. In confirmation of this view, we find another clause of the deed by which it is made a condition of the grant, that neither the grantee nor his assigns "do at any time hereafter erect or permit or cause to be erected, any mill, or mill dam upon any creek, kill, or river, or stream of water, within the said premises." The condition it will be perceived is as broad as the right reserved, if that extended to all the creeks, streams, &c., but it is not in harmony with the construction of the Supreme Court, which limits that right to such *use* of the water as may be deemed requisite for mining purposes.

We may ask why prohibit the grantee from the use of the water not reserved to the grantor, and therefore, of no value to him?

The answer given by the learned Judge, who delivered the opinion of the Supreme Court is, that the lessors or their friends might have claimed a monopoly of the milling business. This is certainly a substantial reason why the grantor should reserve *all the water*, but not a very satisfactory explanation why the *condition* should be more extensive than the *exception*. I feel great confidence, therefore, in the opinion, that the construction given to this part of the grant by the defendant below, is the correct one, and that the Circuit Judge erred in refusing to charge as requested, "that the reservation in said deed of "all creeks, kills, streams and runs of water," was an absolute reservation of the same for any and every purpose."

It was argued that the conveyance from French to Van Auken, reserved no right to flow any part of the lands conveyed, and must, therefore, be deemed absolute, and the grantor was thereby divested of all right to flow the premises in question.

We have attempted to show that the reservation in the lease from Ten Broeck to Bullock, of "all creeks, kills, runs and

streams of water," was unqualified. To what did the parties suppose these terms to relate in 1829, when the deed from French to Van Auken was executed? To the state of the stream as it was at the time of the conveyance? or as it had been in 1793, the date of the lease to Bullock? Their intention is to be collected from the conveyance itself, and the attending circumstances.

And first, none of the words of the reservation above quoted have any *definite legal* meaning.

A creek. according to Webster, sometimes signifies a small bay, inlet, or cove, and more generally in this country, a small river. Kill, is a Dutch word, signifying a channel or bed of the river, and hence the river or stream itself. A stream, means a river, brook, or rivulet, any thing in fact that is liquid and flows in a line or course.

It is presumed that a creek or stream does not cease to be such, merely because its course may be opposed by some obstruction whether natural or artificial. They do not cease to be streams, because in consequence of such obstruction their water may be deepened or flow with a diminished velocity. They would still flow, and the same quantity would pass any given point in its channel in the same time, and they would continue in common parlance to be designated by their former names.

The language of the reservation is therefore equally applicable to the condition of the stream as it was in 1829, or in 1793.

In the second place, the circumstances attending the conveyance point to the former period exclusively. The legal presumption is that the parties were upon the land when the conveyance was executed to Van Auken. (2 *Phillips Ev.* 8 *Lond. ed.*, 731; *Cowen and Hill's notes*, 2 *part*, 1399.)

Let us assume therefore, what is substantially proved, that prior to the sale in 1829, to Van Auken, French had taken the former to the premises, and pointed out to him the dam, and its effect upon the stream, that it caused the water to set back one mile or more; to overflow a part of the premises he

was about to purchase, and the use to which the water was applied; and had then said to him in the language of the deed, I "except and reserve all this creek, kill, stream, or run of water, and you are prohibited from erecting or permitting or causing to be erected any mill or mill dam thereon, and you agree that you will not give or cause to be given any manner of let or obstruction whatsoever to my prejudice in the *full enjoyment* of the rights, titles, and privileges saved to me by the saving and exception aforesaid."

I do not say that the grantee was bound so to understand, but it seems to me that he might naturally infer, that the reservation of the grantor, applied to the stream as it then was, and not as it would be if the dam was removed.

The phrase " full enjoyment" for which the grantee covenants, is to be taken distributively, and applied as well to creeks and streams as to mines. This follows necessarily, if it be admitted that the reservation of the former was absolute, and if this be granted, it is difficult to explain how the grantor, having reserved the stream, was to enjoy the privilege saved to him without the use of the water. Of course the proper exercise of the privilege was a question of fact for the jury. In Provost vs. Calder, (2 *Wend.* 517.) the exception in the deed was as follows:—"Excepting and reserving to myself, &c., the sole and only right of the stream of water running through the land demised, and the party of the second part is not to erect or build any kind of water works on said stream or creek, but the same I hereby reserve to myself as aforesaid." It will be seen that the exception and prohibition are almost in the terms of the one under consideration. In the last clause, "the same I hereby reserve to myself as aforesaid," the immediate antecedent of "same" is, creek or stream, and the reservation to which the word " aforesaid" applies, was of the water, not of the right to build water works, a right not in terms reserved to the grantor, but which the grantee was prohibited from exercising. The Court, however, looking to the intention of the parties, very properly determined that the right to erect water works on

the lands granted was reserved. If we substitute the covenant of Van Auken in this case, for the last clause of the exception in the case cited, the sentence would read thus: "Excepting, &c., and the party of the second part is not to erect or build any kind of water works, on said creek, but he hereby agrees not to give or cause to be given any manner of let or obstruction to said grantor in the full enjoyment of the right and privilege saved to him by the saving and exception aforesaid." If the exception in Provost vs. Calder, was properly adjudged to reserve the land, the covenant above referred to taken in connection with the prohibition and reservation, must be sufficient to reserve a mere easement. It is true, ε lease was taken in that case, and the circumstance is adverted to as evidence of the understanding of the parties. In this also, we have the fact that Van Auken occupied the land for ten years, without objecting to the dam or the flowing of his premises. The evidence of a practical construction is as strong in the one case as the other.

Upon the ground therefore first, that the reservation of all creeks, streams, &c., in the lease of 1793, was absolute, and second, that by the true construction of the conveyance from French to Van Auken, the right to flow the premises for milling purposes, to the extent that they had been previously, and were at the time of the conveyance, overflowed, was reserved by the grantor, the judgment of the Supreme Court should be reversed, and *venire de novo* issue.

JOHNSON, J. The deed from French to Van Auken, executed in 1829, is to be read and construed as though the reservations and conditions of the original lease were inserted in it, and were part and parcel of the language of the instrument. We are then to look at the whole instrument and give it such a construction as shall give full force and effect as far as possible to the grant and reservations according to the sense in which it was mutually understood and relied upon by the parties at the time. The question to be determined is, whether the Normanskill was intended by the parties to be

reserved for the working of mines merely, as assumed by the Supreme Court? It is to be observed that the phrase "mining purposes" used throughout by the Circuit Judge, the Supreme Court, and Counsel for the plaintiff below, is not to be found in the deed. The language there employed is "working mines." By referring to the reservations it will be seen that there is a reservation of "so much ground within the same premises," as the grantor, his heirs and assigns might think necessary "for the erection of the works and buildings, for the convenient working of the said mines." Wood, firewood, and timber are also reserved "to use in building, repairing, accommodating and working said mines." But it nowhere appears that the grantor contemplated using the water-power in working the mines whenever or wherever they might be found, or putting it to any other use than he was making at the time of the grant and reservation. Indeed it is quite as difficult to perceive how the stream could be used to the least advantage for working mines," as it is to believe that French intended to grant to Van Auken the right to destroy his mill and dam immediately below, and only to reserve its use for this visionary and utterly impracticable service. Working mines consists mainly in excavating, draining, and raising ore ; a service performed by miners, and entirely distinct and separate from the business of smelting ores and forging metals, where water or steam-power is necessarily employed. Again, look at the condition. If the grantor intended only to reserve the streams, &c., for mining purposes, why not prohibit the grantee from erecting works to work mines ? Why confine the prohibition to mills and mill dams ? and that too under a penalty so stringent and sweeping as the forfeiture of the whole estate, unless he supposed he had by the reservation secured the use of the water for such purposes to himself.

The learned Justice who delivered the opinion of the Supreme Court, adverting to this condition in the deed or lease, says : "The lessors or their friends might have claimed a monopoly of the milling business for the neighborhood, and the condition might have been inserted to secure that." I

think it quite obvious that such was the object of inserting this condition. But how was that object to be secured? Surely not by reserving the water merely for working mines! The construction of the Supreme Court shuts up the stream forever for milling purposes, unless these conflicting titles shall again chance to unite in the same person; and whatever may be its capacity for useful employment, or the wants and necessities of the public, it can only be brought into requisition on the discovery of a mine, in some location where hydraulic power may be "conveniently" tasked in excavating, and raising ore or other mineral substance to the surface.

This construction seems to me as much at war with all sound legal rules of interpretation as it is with a judicious public policy. I think we shall best give effect to the spirit, and intent of the instrument and the intentions of the parties by holding that in judgment of law, the grantor reserved the right to use the water as he was then using it, and as it had been used long antecedent to the reservation; and that we are bound to presume such to have been the intentions, unless it is limited and conferred to some other or different use by express and unequivocal terms.

But it is said that if the reservation of the stream is absolute and not limited to working mines merely, still the defendant below has no right to maintain his dam or flow the land of the plaintiff below beyond the ancient and natural bed of the stream. This would be so, if at the time of the grant the stream flowed in its ancient and natural channel, and there was nothing in the reservation to show the purpose for which it was reserved. Here, however, it was different. At the date of this grant, and for a long time prior to that, the defendant's mill-dam had been established, and if we are to believe the testimony of the witnesses, French and Van Auken flowed the water upon the premises in question, as high as it was at the commencement of this suit, and so continued without objection up to the time of the plaintiff's purchase, in 1837. As far back as 1793, as appears by Ten Broeck's deed, the stream was used for a saw-mill, and it might be a

task of no little difficulty at this day to discover the ancient bed of the stream upon the premises in question.

I think there cannot be a reasonable doubt that the reservation in Van Aukin's deed, was a reservation of the use of the stream, as its use and flow were then established, and that it was so understood, and intended by the parties. The reservation and the condition, taken together, fully justify such a conclusion. In Provost vs. Calder, (2 *Wend.* 517.) the reservation was "the sole and only right of the stream of water running through the above demised piece of land, and the party of the second part is not to erect or build any kind of water-works whatsoever, on said stream of water or creek, but the same I hereby reserve to myself as aforesaid," and this the Court held to be a reservation of the right to use the water power upon the land. In that case, as in the one before us, it will be seen that there was only a reservation of the stream coupled with a provision that the other party should erect no water-works upon it. The cases of Burr vs. Mills, (21 *Wend.* 290, *and* 6 *Connecticut,* 289,) relied upon by the plaintiff's counsel, are cases of a conveyance without any reservation, and are not in point. Here there is a reservation of a stream which the party was then using, coupled with an absolute prohibition of the same use to the other party, and the only question is, as to the nature, purpose, and extent of the reservation. I am of opinion that the Judge erred in the construction of the reservation in the deed, and that the judgment should be reversed.

JONES, J. and WRIGHT, J., concurred in the result of the preceding opinions.

BRONSON, J., delivered an opinion in favor of affirming the judgment, with whom RUGGLES, and GRAY, Js., concurred.