## In re SIGNOR.

(District Court, N. D. New York. March 17, 1913.)

**1. EVIDENCE (§ 419\*)—PAROL EVIDENCE—WRITTEN INSTRUMENT—CONSIDERA-TION—VARIANCE OF TERMS.**

Where a chattel mortgage assigned as collateral security was attacked in bankruptcy proceedings against the mortgagor on the ground that the amount due had been materially overstated on refiling, parol evidence of the mortgagee as to the items making up the amount of the mortgage, and that on the date of the first renewal the mortgage had been reduced to $5,600, but at that time the mortgagor was indebted to the mortgagee for much more than the face of the mortgage, was admissible to show the exact consideration of the mortgage at that time, but not to vary, limit, or extend its terms.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1912–1928; Dec. Dig. § 419.\*]

**2. CHATTEL MORTGAGES (§ 194\*)—ASSIGNMENT AS SECURITY—RENEWALS.**

Where a chattel mortgagee assigned a mortgage to W. as collateral security, it was the mortgagee's duty to keep the mortgage alive by filing renewals required by Lien Law N. Y. (Consol. Laws 1909, c. 33) § 235, and to state the amount due and unpaid, or to grow due on the indebtedness secured by the mortgage; and hence the mortgage was not rendered invalid as against the assignee by an overstatement of the amount due, alleged to have been negligently made by the mortgagee without fraud.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 426, 427; Dec. Dig. § 194.\*]

**3. MORTGAGES (§ 461\*)—PAROL EVIDENCE—WRITTEN CONTRACT—CHATTEL MORTGAGE—INDEBTEDNESS SECURED.**

Where from the language of a chattel mortgage in controversy a question of fact was presented whether it was intended to secure future indebtedness at all times up to $6,800, it would have been competent for the mortgagee to have testified as to the book accounts and notes which existed, and what indorsement had been made, and especially what "other indebtedness" secured by the mortgage existed, and what was said between the parties connected with the execution of the mortgage, but it was error to permit him to state what the mortgage was given to secure in explanation of the terms of the mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 1353–1360; Dec. Dig. § 461.\*]

In Bankruptcy. In the matter of bankruptcy proceedings of Arthur M. Signor. Petition to review a referee's order holding certain chattel mortgages void as to creditors for omission on refiling to correctly state the amount due or due and unpaid thereon on the ground that the amount was materially overstated. Remanded for rehearing.

Curtiss, Keenan & Tuthill, of Binghamton, N. Y., for Caleb P. Whipple, claimant.

Roger P. Clark and William H. Riley, both of Binghamton, N. Y., for trustee.

RAY, District Judge. On or about January 15, 1910, Arthur M. Signor was duly adjudicated a bankrupt, and in due course a trustee was appointed and qualified. March 8, 1905, said Signor gave to

---

\*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Hobbs Bros. a chattel mortgage on certain personal property to secure the payment of the sum of $1,500 and this mortgage was filed September 14, 1908; October 22, 1906, said Signor gave to Hobbs Bros. another chattel mortgage to secure the payment of the sum of $6,800, which was filed November 2, 1906; and October 15, 1907, said Signor and Cora C. Signor, who was his wife, gave to said Hobbs Bros. another chattel mortgage to secure the payment of the sum of $11,650, which was filed on the same day, October 15, 1907. The indebtedness secured by said $1,500 chattel mortgage constituted part of the consideration for the $6,800 mortgage and said '$1,500 and said $6,800 mortgages formed part of the consideration for said $11,650 mortgage, but said prior mortgages were not satisfied or paid by the giving of the last-mentioned mortgage. On the said 15th day of October, 1907, said Hobbs Bros. duly assigned the said $6,800 mortgage and said $11,650 mortgage to the claimant Caleb P. Whipple to secure him for certain indebtedness owing by Signor to Whipple, and the assignment was duly filed the same day. It contained no comment as to the amount due and unpaid thereon, and contained no reference to any payments on same or either of them. That assignment of such mortgages was on the condition:

"That if a certain promissory note for the sum of $2,117.49, with interest, bearing date October 10, 1907, given by the said A. M. Signor to the said Caleb P. Whipple and any and all renewal or renewals thereof, together with any payments on account of any principal or interest which the said Whipple shall make upon a certain chattel mortgage given by the said Arthur M. Signor to May L. Signor and Fred D. Signor May 25, 1905, then this assignment to be void."

The assignment has not been returned, but I find two copies both reading as above. I will presume it was intended to provide that the assignment should be void if such note and other sums mentioned were paid to Whipple. November 27, 1907, there was a further assignment, or so-called enlargement of the first assignment, so as to make the assignment security to Whipple for a note of $807.49 dated that day, and also such sums as Whipple might pay for fire insurance on the property covered by the mortgages.

It seems that at the time of the institution of the bankruptcy proceedings there was due and owing from Signor to Whipple, secured by such assignment of such mortgages, the sum of $5,077.88. The mortgage of October 22, 1906, for $6,800 contains the following:

"Know ye that I, A. M. Signor, of Binghamton, N. Y., party of the first part, am indebted unto Hobbs Bros., of Nineveh, Broome Co., N. Y., of the second part, in the sum of six thousand eight hundred dollars, being for promissory note (conceded to be notes) and book account due and to become due Hobbs Bros. from me, and for indorsing with me by either Geo. W. Hobbs or Chas. H. Hobbs, and other indebtedness from me to either or both of the Hobbs Bros. Now for securing the payment of the said debt and the interest thereon from *the* date of the said Hobbs Bros. I do * * * Provided always and this mortgage is on the express condition that if the said A. M. Signor shall pay to the said Hobbs Bros., or assigns, the sum of six thousand eight hundred dollars and ―――― cents, with interest thereon as follows, viz.: As per terms of above mentioned notes and accounts all within *one year* together with all expenses of renewals or extensions of all or any part of the within mentioned note or mortgage, or both, and looking after the prop-

erty mortgaged, also the cost of insurance on said property which I hereby authorize Hobbs Bros. or assigns, to obtain, which note and total expenses I do hereby agree to pay, then this transfer to be void and of no effect, but" [here follows power of sale, etc].

It is contended in behalf of Mr. Whipple that this mortgage was security, not only for the indebtedness of Signor to Hobbs Bros. as it existed at the date of the execution of the mortgage, but for indebtedness for notes thereafter given by Signor to or indorsed by Hobbs Bros. and also subsequent book accounts.

The $11,650 mortgage contains the following:

"Being for loans made this day, goods furnished, labor performed, services rendered, indorsing notes and for promissory notes due and to become due, signed or indorsed by A. M. Signor or Cora C. Signor, or both, and indorsed by Hobbs Bros. and other obligations owing from either or both of us to either or both of said Hobbs Bros., including a debt of six thousand eight hundred dollars ($6.800) secured by a chattel mortgage given October 22, 1906, which mortgage is to remain in force as a claim against property therein named until six thousand eight hundred dollars ($6,800) of this total shall be paid."

This was a claim and assertion by Hobbs Bros. and an admission by Signor and Cora C. Signor that $6,800 was unpaid thereon on the 15th day of October, 1907.

After this assignment Mr. Whipple did not file any renewal of such chattel mortgages, but Hobbs Bros. did, and it is claimed, first, that Hobbs Bros. in making such renewals largely overstated the amount due on same, respectively, wherefore they are void as to creditors, and the referee so found; and, second, that as Whipple, the assignee, did not file renewal statements or a copy of the mortgage, same are void as to creditors. This the referee declined to hold. As to such renewal statement of the mortgage for $11,650 the same read:

"The interest of the mortgagee in the property thereby claimed by them by virtue thereof is ($11,650) eleven thousand six hundred and fifty dollars."

And as to each renewal statement of the mortgage for $6,800 the same read:

"The interest of the mortgagee in the property thereby claimed by them by virtue thereof is ($6,800) six thousand eight hundred dollars."

These renewal statements are silent as to the assignments to Mr. Whipple, and contain no reference thereto or to Mr. Whipple as an assignee of any interest in the property.

[1] Mr. George W. Hobbs was permitted to testify under objection to the consideration for the $6,800 mortgage giving the items making up that sum, and which amount to about $6,800. October 22, 1907, the date of the first renewal of this mortgage, these items of indebtedness had been reduced so as to total only $5,600, but Signor at that time was owing Hobbs Bros. much more than $6,800. This evidence was competent to show the exact consideration of the mortgage at that time but not to vary, limit, or extend its terms. State Bank, etc., v. Lighthall, 46 App. Div. 396, 61 N. Y. Supp. 794; Farr v. Nichols, 132 N. Y. 327, 30 N. E. 834; Emmett v. Penoyer, 151 N. Y. 567, 45 N. E. 1041.

There is no evidence that Hobbs Bros. in filing the renewals of these chattel mortgages designed or intended to overestimate or overstate the amounts due and unpaid or to grow due thereon, respectively, and in view of the involved condition of the dealings between Hobbs Bros. and Signor and Hobbs Bros. and Mrs. Signor, and the fact that there was a running account and other indorsements of notes, I think Hobbs Bros. did not know they were making and filing an overstatement of such debt, if they did. Hence it must be found and held that there was no intent or purpose to defraud or mislead any one.

[2] One question, then is: Does the mere fact that in filing these statements Hobbs Bros. carelessly or negligently overstated their interest in the mortgaged property—that is, the amount due and unpaid or to grow due on such mortgages—make them void in favor of creditors and as against Mr. Whipple? The Lien Law of the state of New York (article 10, § 235 ["Chattel Mortgages"] c. 33, Consolidated Laws), provides, so far as applicable here, as follows:

"Mortgage invalid after one year, unless statement is filed. A chattel mortgage, except as otherwise provided in this article, shall be invalid as against creditors of the mortgagor, and against subsequent purchasers or mortgagees in good faith, after the expiration of the first or any succeeding term of one year, reckoning from the time of the first filing, unless, (1) within thirty days next preceding the expiration of each such term, a statement containing a description of such mortgage, the names of the parties, the time when and place where filed, the interest of the mortgagee or any person who has succeeded to his interest in the property claimed by virtue thereof, or (2) a copy of such mortgage and its indorsements, together with a statement attached thereto or indorsed thereon, showing the interest of the mortgagee or of any person who has succeeded to his interest in the mortgage, is filed in the proper office in the city or town where the mortgagor then resided."

The assignment to Mr. Whipple from Hobbs Bros. of these chattel mortgages did not make him the owner thereof except by way of collateral security. It was in the nature of a pledge, and Hobbs Bros. at any time, by paying Whipple the amount due him, could have demanded the mortgages, and could have proceeded to enforce and collect the same for their own benefit. It was their duty to file renewals and state the amount due and unpaid or to grow due on same correctly. As they did file renewals and in such renewals did state the amount due and unpaid or to grow due, it would seem Whipple had the right to rely thereon. Clearly this is so as between Whipple and Hobbs Bros. Whipple did not know, and could not know, except by inquiry of Hobbs Bros. and Signor, how much was unpaid. He, of course, knew his interest in the mortgaged property, which was less than the sums stated in the renewals. So far as Whipple is concerned, no creditor was misled or defrauded by anything he did.

The learned referee cites Marsden v. Cornell, 62 N. Y. 215, 219, Ely v. Carnley, 19 N. Y. 496, and Tremaine v. Mortimer, 128 N. Y. 1, 27 N. E. 1060, as conclusive that these mortgages were invalidated as to creditors by reason of these overstatements as to the amount due and unpaid or secured and unpaid made in and at the date of such renewals, respectively. Tremaine v. Mortimer has no application here whatever. In that case there was *no refiling* whatever; here

there was. Marsden v. Cornell et al. is not at all decisive of this case, as there no statement whatever as to the amount due or secured and unpaid at the date of refiling was filed. There was no compliance with the statute. And all that the court said, obiter, was that an omission to state the amount due or secured and unpaid at the date of refiling is a "badge of fraud." That is, it may and it may not justify a finding of fraud. This is what was held in Frost v. Warren, 42 N. Y. 204, where it was held:

"A mortgage is *not fraudulent in law* from the mere fact of its expressing a greater sum secured than the real amount of the debt which the mortgagor owes to the mortgagee."

Ely v. Carnley, 19 N. Y. 496, is a case where the mortgagee did not file the original mortgage, but undertook to file "a *true* copy" as the original filing, and as the statute of 1833 required. The paper filed overstated the amount by $100. This was held *not a fraud,* but a noncompliance with the statute as to filing. In Porter v. Parmley, 52 N. Y. 185, and Steele v. Benham, 84 N. Y. 634, there was no refiling at all. In Russell v. St. Mart., 180 N. Y. 355, 73 N. E. 31, it was held that a chattel mortgage given by two persons residing in different places must be filed in the towns and county of the residence of both, or there is no compliance with the statute as to filing. McCrea v. Hopper, 35 App. Div. 572, 55 N. Y. Supp. 136, affirmed by Court of Appeals, 165 N. Y. 633, 59 N. E. 1125, is a case where there was no compliance with the statute as to refiling. In Craft v. Brandow, 61 App. Div. 247, 70 N. Y. Supp. 364, the name James B. Stead, by mistake, was inserted as mortgagee in place of that of Sylvester B. Sage. Stead made no claim under the mortgage, and there was no proof that any creditor was misled. The mortgage was held valid, and it was also held that the true mortgagee could enforce it without reformation. In Chafey v. Mathews, 104 Mich. 103, 62 N. W. 141, 27 L. R. A. 558, a mortgage securing an indebtedness due to the bank ran to the cashier of the bank in his individual name only, but the other creditors of the mortgagor knew the purpose of the mortgage, and were not in fact prejudiced and it was held valid.

But, leaving this for the moment, what is the true construction and meaning of the following language used in the $6,800 mortgage: "I, A. M. Signor, of Binghamton, N. Y., party of the first part, *am indebted* unto Hobbs Bros., of Nineveh, Broome Co., N. Y., of the second part, in the sum of six thousand eight hundred dollars, *being for* promissory notes and book account due *and to become due* Hobbs Bros. from me, and *for indorsing with me* by either Geo. W. Hobbs or Chas. H. Hobbs, and *other indebtedness* from me to either or both of the Hobbs Bros. now for securing the payment of the said debt, and the interest thereon from the date of the said Hobbs Bros.," etc.? The words are, I "am indebted," not am to become indebted, and "*being* for promissory notes," and "book account due and to *become due*" and "for indorsing with me" and "*other* indebtedness from me to either or both," etc. Book accounts may be due in præsenti or in futuro and "indorsing with me" might refer to future indorsements; but, if intended to refer to future indorsements, would not the parties have

said, "for indorsing with me heretofore or hereafter," and, if intended to cover future book accounts, would they not have said book account existing or to exist hereafter and due or to become due? The claimant's attorney ably contends that the words "for indorsing with me" mean indorsing hereafter, now, and heretofore, or the words would have been "for having indorsed" and "for notes which have been indorsed," and that "for indorsing with me" is necessarily a contemplated act, an act in futuro, and also that the words "and other indebtedness" are general, elastic, and comprehensive in their meaning, and indicate that the mortgage was intended as security for further and subsequent indebtedness, inasmuch as the then existing indebtedness under the undisputed evidence was for book accounts and promissory notes indorsed solely, and that these words "and other indebtedness" could only refer to indebtedness thereafter arising or incurred. That otherwise the words "and other indebtedness" were surplusage or meaningless. He invokes the familiar rule that some meaning must be given to all the words used in such an instrument, and that it is presumed they had a meaning and were so intended. He contends, and ably contends, that Mr. Whipple with such an instrument, and in view of the wording of the assignment made by Hobbs Bros. to him, already quoted, and the subsequent and larger mortgage, had the right to assume that indebtedness incurred subsequent to the execution of this $6,800 mortgage was secured thereby. It is urged that as the wording of this mortgage is susceptible of two constructions, or, rather, that if it is, Hobbs Bros. and the mortgagors, Mr. and Mrs. Signor, gave it practical construction when the larger subsequent mortgage was given, and treated and construed it as one in force to its full amount and necessarily as covering indebtedness and indorsements subsequent to its execution; but limited always to the sum of $6,800. The larger mortgage covers property not included in the $6,800 mortgage, and this fact, it is contended, with the fact that it was limited to $6,800, does away with any presumption that the larger mortgage was given for the reason the $6,800 mortgage did not cover subsequent indebtedness.

In Farr v. Nichols, 132 N. Y. 327, 30 N. E. 834, the language of the mortgage was the payment of "any and all notes, checks and drafts indorsed by the said Archibald Farr for the benefit or accommodation of said Robert H. Doxstater, or of any firm in which said Robert H. Doxstater is interested or in any manner connected." It was held that this language covered notes subsequently made and indorsed as well as those then in existence. The court, all concurring, said:

"The mortgage was for the protection of the plaintiff. The words 'any and all notes, checks and drafts indorsed' are comprehensive words; there are no words restricting the meaning of the word 'indorsed,' such as now, heretofore, already, or which have been. The plaintiff may construe the promise as beneficially to himself as its terms will fairly admit."

It should be stated that in that case the mortgage was for an expressed consideration of $15,000, and the only note indorsed at the time of its execution was one for $3,000. Here there was room for the inference which the court drew that the mortgage was intended to

cover a large indebtedness up to $15,000, which must have been a subsequent indebtedness. In Simons v. First National Bank, etc., 93 N. Y. 269, the language was, "intended as collateral security for the payment of any indebtedness" of the mortgagors to the mortgagees, and when the mortgagors "shall have paid all such indebtedness this mortgage shall become null and void." It was held this covered a debt subsequently incurred. The court said:

"It will be observed that there are no express words confining the security to debts existing when the mortgage was made. The words are *any* indebtedness. The language may refer as well to contemplated as to existing debts," etc.

At the date of the execution of the instrument no debt existed, but one was thereafter incurred.

In Merchants' National Bank v. Hall, 83 N. Y. 338, 38 Am. Rep. 434, the language was, "as security for the payment of any demands" plaintiff "may from time to time have or hold against" E. W. H. Held this covered debts subsequently incurred, as well as those then existing. Here there was, of course, from the words "from time to time hold" a fair inference that it was intended to include indebtedness subsequently incurred by the mortgagor to the mortgagee.

In Huntington v. Kneeland, 102 App. Div. 284, 92 N. Y. Supp. 944, a deed absolute in form was held to be in fact a mortgage to secure future advances. The court said:

"It is undoubtedly true, within proper limits, that an agreement to secure future advances must be confined to such as are in the contemplation of the parties at the time when the agreement is made, for nothing not within the intention is included in any contract; all the intention must be derived from the words and surrounding circumstances, * * * but here the language used is general in its nature with no suggestion that it is limited to any particular transaction," etc.

The court then goes on to say that if the instrument, general in its language, was not intended to cover future advances, Mr. Huntington, who continued to make advances without other security, "must have departed materially from the practice of a prudent business man." In this case the evidence shows that all of Signor's property, real and personal, was covered by mortgages to its full value substantially, and that Hobbs Bros. knew this. Still, until the giving of the larger chattel mortgage, Hobbs Bros. continued to indorse notes and give credit on account. From this the court is urged to construe the words quoted as intended by the parties to cover the future indebtedness, especially the words "and other indebtedness"; there being none at the time. As there was after-acquired property which was not covered by the $6.800 mortgage, and which the parties desired to cover, and as the debts to Hobbs Bros. concededly had increased, and the $6,800 mortgage was limited to that sum, it is urged that no significance can be given to the giving of the second mortgage as indicating that the $6,800 mortgage was intended to secure only the indebtedness to Hobbs Bros. existing when it was given, and certain items thereof aggregating, in round numbers, that sum.

[3] From the cases cited, it is quite clear that, in view of the language of the chattel mortgage, a question of fact was presented wheth-

er the mortgage was intended to secure at all times indebtedness up to $6,800, even if some of it was thereafter incurred. If so, and payments were made on certain items and notes, but other notes were given or indorsed, and other book account incurred so that the indebtedness was at all times substantially $6,800, then this continuing security was good to that amount, and there was no overstatement in the renewals.

From the cases cited it is clear that the true construction of the language of the mortgage and its true meaning could be aided by ascertaining the actual intent of the parties to it. In doing this, it was competent to show, first, the indebtedness of Signor to Hobbs Bros. at the time it was given including indorsements of notes; and, second, the mortgage; and, third, the agreement of the parties, if any, as to what was or should be included in and secured by the mortgage. What was said between Signor and Hobbs Bros. at the time and in connection with the giving of the mortgage on this subject was competent, not to vary the terms of the mortgage, but to explain and make clear. But it was not competent or proper for either Signor or Hobbs or either of the mortgagees to testify under objection that the mortgage covered indebtedness then existing, and no other; certain notes and no others; certain book accounts, and no others. It was not for either Hobbs or Signor to say that the mortgage was given to secure promissory notes given up to October 22, 1906, and not others given later, and book accounts for work done and materials furnished before that only, and indorsements made up to the same date. This was the very question in issue, and the conclusion or opinion of Mr. Hobbs was not competent. The conclusion was to be drawn by the court from relevant facts proved. Mr. Hobbs, under objection, was allowed to cover the whole controversy by giving his conclusion or opinion as to what the mortgage was given to secure, and as to the meaning of the terms used in the mortgage:

"Q. What was the $6,800 chattel mortgage given to secure?

"By Mr. Keenan: That is objected to on the ground that it is incompetent, irrelevant, and immaterial. The mortgage is the best evidence, and speaks for itself. (Objection overruled.)

"By the Referee: I will allow the witness to explain what these terms mean, what promissory notes, what book accounts, and what notes or other indebtedness on the mortgage. (Exception.)

"A. The promissory notes given up to that time, October 22, 1906, by Signor, and the book accounts was work done on carriages, stock furnished, freight paid, and other items. The indorsing mentioned was for what had been done up to that date by myself and my brother."

The referee has accepted this as uncontradicted and conclusive. In short, Mr. Hobbs was allowed to interpret the language of and construe the mortgage, state what it secured, and determine the whole controversy. I repeat, it would have been competent for Mr. Hobbs to have stated fully what book accounts and notes existed, what indorsements had been made, and *especially* what "other indebtedness" *then* existed, and also all that was said between the parties to the mortgage connected with its execution. When this was done, it was for the court to say what the mortgage was given to secure, and whether it covered any "other indebtedness" than that then existing.

If the question had been whether or not there was any agreement as to what was to be secured by the mortgage, and the witness had answered in the affirmative, and he had then been asked what indebtedness and had given the answer quoted, in the absence of an objection that the witness must state what was said, I should be disposed to regard the answers as a mere statement or listing of the debts agreed to be secured by the mortgage, but this is not the purport of the question and ruling of the referee or of the answer. "Q. What was the $6,800 chattel mortgage given to secure?" The objection was that the mortgage spoke for itself, and was the best evidence. The referee then ruled that he would let the witness *explain what these terms mean,*" referring to the terms or words of the mortgage itself—"what promissory notes, what book accounts, and what notes or other indebtedness on the mortgage." It was a direct ruling that Mr. Hobbs might testify that the following words in the mortgage: "Being for promissory notes and book accounts due and to become due Hobbs Bros. from me, and for indorsing with me by either Geo. W. Hobbs or Chas. H. Hobbs, and *other indebtedness* from me to either or both of the Hobbs Bros"—referred to and covered and meant "promissory notes given up to that time, October 22, 1906, by Signor," and book accounts for work then done and carriages and stock furnished and freight paid, etc., prior to that date, and notes indorsed prior to that time only. This construction and interpretation of the language of the mortgage by Hobbs, especially as against Whipple, was harmful and prejudicial and illegal and incompetent evidence. As already stated, and as shown by all the authorities, the language of the mortgage quoted is broad enough to cover notes *then given* and in existence and notes *thereafter* given, notes *then* indorsed and notes *thereafter* indorsed, book accounts then existing, due or to grow due, and book accounts *thereafter* incurred. It was not for Mr. Hobbs to construe the meaning of the language or expressions of the mortgage quoted, but for the court in the light of surrounding circumstances and what was said at that time or in connection with the giving of the mortgage. This is an important case to both the trustee and the creditors and to Mr. Whipple, and here was the crucial point in the case. If in answering Mr. Hobbs had said it was *agreed* that the mortgage should secure certain things, naming them, or if the referee had ruled that Mr. Hobbs might state what indebtedness it was agreed should be included, the case would be quite different, and in such case Mr. Keenan would have been required to demand that the witness give the conversations. But the referee expressly ruled that Mr. Hobbs might construe the language of the mortgage and limit its meaning, which the witness proceeded to do. I do not find in the record anything showing the agreement, if any there was, between Signor and Hobbs as to what items should be covered or secured by the $6,800 mortgage.

The order of the referee is reversed, and the case is sent back to Referee B. Roger Wales for a new trial on the issues certified and involved, with the suggestion that there be express findings, with other essential matters: When the mortgage was given: (1) What was the indebtedness of Signor to Hobbs Bros. by way of book accounts and otherwise? (2) What notes had then been indorsed which were out-

standing? (3) After the mortgage was given, what payments were made, and where and by whom and to whom? (4) What book accounts were incurred thereafter? (5) What notes were indorsed thereafter?

I express no opinion at this time, as there must be a new hearing on the other questions in the case.